AUSA: Niall M. O'Donnell    Telephone: 313-226-9616

Special Agent : Lauren Williamson    Telephone: 313-550-2572

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Michigan

United States of America,

        Plaintiff,

v.

Javed Akhtar,

        Defendant(s).

Case: 2:14-mj-30567
Judge: Unassigned,
Filed: 11-05-2014 At 11:50 AM
RE: SEALED MATTER (EOB)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of September 2010- Present _____, in the county of Wayne _____ in the Eastern _____ District of Michigan _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1347 | Health Care Fraud |
| 18 U.S.C. § 1349 | Conspiracy to Commit Health Care Fraud |
| 18 U.S.C. § 371 | Conspiracy to Pay or Receive Kickbacks |

This criminal complaint is based on these facts:

FILED
NOV 05 2014
CLERK'S OFFICE
DETROIT

☑ Continued on the attached sheet.

_____
Complainant's signature

Lauren A. Williamson, Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: November 5, 2014 _____

City and state: Detroit, Michigan _____

_____
Judge's signature

United States Magistrate Judge David Grand
Printed name and title

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Lauren A. Williamson, being first duly sworn, hereby state as follows:

1.    I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed since February 2012.  I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).  In that capacity, I am empowered by law to conduct investigations and to make arrests for federal felony offenses, including those involving the laws found in 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1349 (Health Care Fraud Conspiracy), and 18 U.S.C. § 371 (Conspiracy to Pay and Receive Kickbacks).  I have gained expertise in how to conduct such investigations through seminars, classes, prior education, and related work.  I am responsible for investigations of fraud in and around the Detroit, Michigan area involving federal healthcare programs.  I have received basic criminal investigator training as well as specialized training in the investigation of fraud and financial crime.  Previously, I was employed as an Assistant District Attorney with the Erie County District Attorney's Office in Buffalo, New York.  I have used many investigative techniques while conducting criminal investigations.  For example, I have conducted numerous searches, interviewed witnesses, and performed physical or electronic surveillance.  I have also participated in the execution of search warrants for residences, businesses, vehicles, and computer systems related to various criminal investigations.

2.     I have knowledge of the facts set forth in this affidavit as a result of my participation in the investigation as well as information provided to me by other law enforcement agents involved in this investigation and others, and Medicare claims data and bank records.  Information pertinent to this investigation was also provided by TrustSolutions, LLC (T.S.), Cahaba Safeguard Administrators, LLC ("Cahaba"), private entities which contract with HHS to perform investigations and audits designed to protect the Medicare program from waste, fraud, and abuse.  Since this affidavit is being submitted for the limited purpose of supporting a criminal complaint, I have not included each and every fact known to me concerning this investigation.

## Overview

3.     I have been involved in an investigation of Javed Akhtar related to billing the Medicare program for services that were not provided or not medically necessary, in violation of 18 U.S.C. § 1347, to conspiring to commit health care fraud, in violation of 18 U.S.C. § 1349, and to conspiring to pay or receive health care kickbacks, in violation of 18 U.S.C. § 371.

4.     The evidence shows that Javed Akhtar ("Akhtar") recruited patients initially for Angle's Touch Home Health Care LLC, a home health care agency that is the subject of a pending indictment in the Eastern District, *see United States v. Poonpanij, et al.*, 12-20603 (E.D. Mich.) (Tarnow, J.), and then subsequently for his

own company, Life Choice Home Health Care LLC ("Life Choice"). In exchange for signing up for medically unnecessary home health care services, beneficiaries were paid a kickback of between twenty and three hundred dollars by Akhtar. Life Choice then used the patients' Medicare information to bill Medicare for home health care services which were not rendered and/or not medically necessary.

### Background

5.    The FBI and the Department of Health and Human Services, Office of Inspector General (HHS-OIG) initiated this investigation based upon a referral received from the Health Care Fraud Division within the Michigan Attorney General's Office and other sources. It is alleged that Javed Akhtar's home health agency, Life Choice, is billing Medicare for home health care services that were not rendered and not medically necessary, and paying kickbacks to Medicare beneficiaries for the use of their Medicare numbers to bill for home health services that were not provided and not medically necessary.

### A.    The Medicare Program

6.    The Medicare Program ("Medicare") is a federally-funded health care program providing benefits to persons who are over the age of sixty-five or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency within the Department of Health and Human

Services (HHS).  Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

7.     Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

8.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).  Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A.

9.     This investigation involves home health care services.  Home health care services typically include skilled nursing, physical therapy, or speech pathology services to homebound patients.  Home health services are covered by Medicare Part A.

10.     Medicare claims for Part A and B are processed and paid by private insurance organizations, known as fiscal intermediaries and carriers, respectively, who contract with CMS to administer their specific part of the Medicare program.

**B.     Medicare Home Health Requirements**

11.     Medicare's regulations for home health services require a home health agency ("HHA") be licensed by the state in which it is located, submit an application to Medicare, and be certified by a state agency.  A qualified HHA

4

receives a Medicare provider number that is used for the submission, processing, and payment of claims.

12.     Medicare coverage for home health services requires that the following qualifying conditions, among others, be met:  (a) the Medicare beneficiary is "homebound" and does not have a willing care-giver to assist him or her; (b) the beneficiary needs skilled nursing services, physical therapy, or occupational therapy; (c) the beneficiary is under the care of a qualified physician who established a written Plan of Care for the beneficiary, signed by the physician and by a Registered Nurse (RN) (or therapist if only therapy services are provided) from the home health agency; (d) skilled nursing services are provided by, or under the supervision of, an RN in accordance with the Plan of Care; and (e) the services provided are medically necessary.

13.     A beneficiary is considered "homebound" if he or she has a condition, due to an illness or injury, that restricts his or her ability to leave the home except with the aid of another individual or a supportive device, or if the beneficiary has a condition such that leaving his or her home is medically contraindicated.

14.     To determine the proper level of care for a particular beneficiary, Medicare requires that HHAs perform a comprehensive initial evaluation, which includes a patient specific, comprehensive assessment that accurately reflects the patient's current health and provides information to measure the patient's progress.

5

Medicare requires that (1) an RN or qualified therapist perform the initial assessment (on an OASIS form), and (2) HHAs maintain a clinical record of services they provide to each beneficiary, including signed and dated clinical and progress notes recording each home visit made to the beneficiary (Skilled Nursing Notes). Skilled Nursing Notes must include the identity of the individual who performed the visit, the name of the patient, and the type of service performed.

15.     Medicare compensation to HHAs is based upon a prospective payment system (PPS), which pays the HHA a base payment that can be adjusted to reflect the severity of the beneficiary's condition and care needs. Medicare PPS pays HHAs for every 60-day "episode" of services provided to each beneficiary. At the beginning of an episode, Medicare will pay 60 percent of the cost of the episode once the patient has been evaluated and a Plan of Care determined. At the end of the episode, Medicare pays the balance based on how much home health care was actually provided in the episode. If the beneficiary is still eligible for care at the end of an episode, a second episode of services can be provided. Each subsequent episode must be based upon a new assessment of the patient, including a new OASIS form, wherein the beneficiary's physician and RN (or therapist) re-certifies the beneficiary's medical condition, need for services, and a new Plan of Care.

## PROBABLE CAUSE

### A.    Health Care Fraud Scheme

16.    Life Choice is a Michigan company owned and operated by Javed Akhtar.  Akhtar is a licensed practical nurse in the State of Michigan.  Life Choice was incorporated by Akhtar on or about June 24, 2010.  The Articles of Organization identify the purpose of Life Choice as being to provide home health care services, nursing, physical therapy, occupational therapy, and home health aides.  The 2012 Annual Statement for Life Choice, filed February 17, 2012, with the Michigan Department of Licensing and Regulatory Affairs (DLEG) lists the current business address for Life Choice as 12345 Telegraph Road, Suite 11, Taylor, Michigan 48180 and a registered office of 12345 Telegraph Road, Suite 11, Taylor, Michigan 48180.  However, the medical record storage location provided to Medicare on or about November 26, 2013, lists 20600 Eureka Rd., Suite 705, Taylor, Michigan 48180 as the location for the storage of records.  Through employee interviews and brief surveillance, it is believed that Life Choice primarily operates out of 20600 Eureka Road, Suite 705, Taylor, Michigan 48180.

17.    A summary of Life Choice's Medicare enrollment provided by Cahaba shows that Life Choice was approved for enrollment with Medicare on or about August 18, 2010.  Akhtar was listed as a contact person on the provider enrollment form with an email address of Lifechoicehhc@gmail.com.  Afsheen Habib, Akhtar's

7

wife, was also listed under managing control of Life Choice. Akhtar signed the Electronic Data Interchange (EDI) on behalf of Life Choice on August 27, 2010. Medicare approved Life Choice as a provider and issued Life Choice a provider transaction access number (PTAN), effective January 31, 2012. The Medicare Electronic Funds Transfer (EFT) bank account for Life Choice is held at Chase Bank with Javed Akhtar listed as the sole signatory as of May 29, 2012.

18.    The evidence developed shows that Javed Akhtar recruited patients initially for Angle's Touch Home Health Care, a home health care agency that is the subject of a pending indictment, and then subsequently for his own company, Life Choice. In exchange for signing up for medically unnecessary home health care services, beneficiaries were paid a kickback of between twenty and three hundred dollars by Akhtar. Life Choice then used the patients' Medicare information to bill Medicare for home health care services which were not rendered and/or not medically necessary.

**B.    Facts Supporting Probable Cause**

19.    Evidence supporting probable cause has been gathered through numerous investigative measures, including, but not limited to: (1) interviews of beneficiaries and relatives of beneficiaries billed by Life Choice and Angle's Touch; (2) interviews of former Life Choice employees; and (3) analysis of Medicare data.

1)    Life Choice Employee Interviews

a.    *Nurse confidential human source*

20.    On or about May 22, 2014, an FBI confidential human source ("CHS 1"), who was employed as a nurse at Life Choice, told agents that the owner of Life Choice, Javed Akhtar, was known as "J." CHS 1 is a Registered Nurse, licensed in the State of Michigan since March 2014, and had previously been a Licensed Professional Nurse since 2008. CHS 1 recalled an instance in or around May 2014, where CHS 1 was performing an "opening" evaluation for a Medicare beneficiary. (Based on my experience investigating home health care frauds in the Detroit area, I am aware that an "opening" refers to the initial evaluation of a Medicare beneficiary, usually performed by a Registered Nurse, in order to begin an episode of home health care.) CHS stated that Akhtar was present for the opening, and that during the opening, the beneficiary asked Akhtar "where is my money?" CHS 1 stated Akhtar responded "You know I don't have any cash."

CHS 1 stated that during later visits, the beneficiary repeatedly asked CHS 1 for money, and then finally refused further treatment from Life Choice.

21.   CHS 1 also reported hearing from other Life Choice employees that Akhtar was paying patients to accept home care. For example, CHS 1 stated that one Life Choice beneficiary, N.F., was discharged from any further home health care services, and that CHS 1 was told by Life Choice employees it was because the family of N.F. was refusing any further services because they were not being paid by Akhtar to receive those services from Life Choice. CHS 1 also stated that CHS 1 personally performed home health skilled nursing services for numerous patients of Life Choice, but told agents that the most of the patients CHS 1 saw receiving home health care services through Life Choice were not homebound.

### b.   Director of Nursing Bozena Werdene

22.   On or about July 22, 2014, agents interviewed another nurse for Life Choice, Bozena "Anna" Werdene ("Werdene"), who worked at Life Choice as Director of Nursing from approximately October 2012 through August 2013. Werdene stated she was hired by the owner of Life Choice, Javed Akhtar, whom she knew as "J," to replace Life Choice's prior Director of Nursing, Judith Ragasa, following Ragasa's arrest. (Ragasa was charged in an indictment centering on Angle's Touch Home Health Care LLC, another HHA operating in the Eastern

District of Michigan. *See United States v. Poonpanij, et al.*, 12-20603 (E.D. Mich.) (Tarnow, J.). Werdene identified a photograph of Javed Akhtar as "J."

23.     While working at Life Choice, Werdene saw patient evaluation forms that had been signed with her name, but that she did not remember performing. After four to five months of working at Life Choice, Werdene realized that Akhtar was signing her name electronically on home health care patient records without her permission and where she did not perform the services. Werdene stated she confronted Akhtar about signing her name reflecting services she did not perform, and he apologized.

24.     Werdene also recalled an instance when a Medicare beneficiary, A.C., made her leave the home during a nursing visit. A.C. told Werdene that Life Choice had billed Medicare for sixteen nursing visits purportedly performed by Werdene, but where Werdene stated she had only performed three nursing visits for A.C. Werdene stated A.C. told her Akhtar had attempted to pay A.C. $20. Werdene also stated that multiple Life Choice beneficiaries made reference to Akhtar paying them, and that they referred to him as "the money man."

### c.     Director of Nursing Judith Ragasa

25.     Judith Ragasa, a nurse for Angle's Life Touch Home Health Care, was previously charged in a 2012 indictment centering on Angles Touch Home Health Care LLC ("Angle's Touch"), a HHA operating in the Eastern District of

Michigan. *See United States v. Poonpanij, et al.*, 12-20603 (E.D. Mich.) (Tarnow, J.). Ragasa was interviewed by agents at the time of her arrest on September 14, 2012. Ragasa told agents that she also worked for Javed Akhtar, who she stated was the owner of Life Choice. Ragasa said that Akhtar was a marketer, who recruited patients for Angle's Touch. Ragasa defined a marketer as someone who goes out and gets patients for home health agencies. Ragasa also stated that the owner of Angle's Touch once offered her $500 per patient to recruit patients, and that Ragasa believed this was how marketers were paid. Ragasa also admitted to paying a marketer $500, at the rate of $100 per patient, at the direction of Angle's Touch's owner. Ragasa also admitted that she was working as a marketer for Life Choice.

26.     At the time of her arrest, Ragasa was found with home health forms for Life Choice—including nursing revisit notes and OASIS forms—that had been signed by Medicare beneficiaries, but were otherwise blank.

27.     Based on my experience as a health care fraud investigator, I am aware of numerous home health care fraud schemes in the Detroit area where individuals obtain beneficiaries' signatures on blank medical forms so that the forms may later be filled in with fake medical information to support false claims to Medicare.

2)   Beneficiary Interviews

28.   Interviews of Medicare beneficiaries corroborate that Akhtar paid kickbacks to recruit patients to sign up for home health care services at both Life Choice and Angle's Touch.

a.   *Confidential Human Source 2 (Life Choice)*

29.   On or about July 16, 2014, an FBI CHS ("CHS 2") told agents that a man named "J" first started paying CHS 2 to accept home health care approximately two to three years ago. CHS 2 identified a photograph of Javed Akhtar as "J." The first time Akhtar paid CHS 2, he paid CHS 2 $300. The most recent payment was approximately two or three months prior to the interview. On that occasion CHS 2 was paid $100. Akhtar always paid CHS 2 in cash. CHS 2 stated that any home health care services received by CHS 2 have been arranged through Akhtar. CHS 2 believed that the first company CHS 2 received home health services through was a company known as MI Choice. That was coordinated through Akhtar.

30.   CHS 2 was also familiar with the company name Life Choice through services coordinated by Akhtar. CHS 2 has a regular doctor who CHS 2 sees for treatment outside of the home. This regular doctor has never talked to CHS 2 about a need for home health care. Furthermore, CHS 2 told agents that CHS 2 never had any trouble dressing, bathing, or performing tasks in and around the home.

31.    Medicare claims data shows that Life Choice was paid approximately $15,650.75 for home health services purportedly provided to CHS 2 between in or around March 2013 and July 2014.

b.    *Medicare beneficiary E.S. (Life Choice)*

32.    On or about July 31, 2014, Medicare beneficiary E.S. identified a photograph of Javed Akhtar as a man from Life Choice who had been to his apartment on two occasions. E.S. stated that during his first visit, Akhtar gave E.S. $20. E.S. stated that Akhtar came again one month later and told E.S. that the nurse who was supposed to visit him was too busy and would not be coming out to his home. E.S. stated that both these visits occurred prior to April 2014. E.S. stated that two physical therapists for Life Choice came to E.S.' home for one visit each, and that a nurse for Life Choice also came to his home twice. On the nurse's first visit with E.S., the nurse took his blood pressure, checked his heart, and then completed paperwork. During the second visit, the nurse brought her dog and simply talked to E.S. A social worker for Life Choice also came to his home, but only one time. E.S. stated that he may have signed blank forms for Life Choice. When informed by agents that Medicare was billed for eight physical therapy visits, E.S. stated, "That thief. They come two times."

14

33.    Medicare claims data shows that Life Choice was paid approximately $2,275.22 for home health services purportedly provided to E.S. between in or around December 2012 and January 2013.

c.    *Medicare beneficiary A.L. (Life Choice)*

34.    On or about July 31, 2014, Medicare beneficiary A.L. told agents he has never received home health care services in his home and that he leaves his home to attend all of his medical appointments. A.L. identified a photograph of Javed Akhtar as a man who approached A.L. while A.L. was in the waiting room at one his medical appointments, and that Akhtar later came to A.L.'s home approximately two weeks after approaching him in the office. A.L. stated that Akhtar went to A.L.'s home twice. During each of those times, A.L. stated Akhtar paid A.L. $50 to sign papers. However, A.L. stated Akhtar never told A.L. the name of Akhtar's company and A.L. did not recognize the name Life Choice. A.L. stated that on two occasions, nurses came to his home and one of the nurses had him sign blank documents. A.L. also stated that those were the only times nurses have been to his home. When shown copies of Life Choice home health patient records that had been provided to Medicare, A.L. identified his signature in an admission contact form and two patient signature logs.

35.    Medicare claims data shows that Life Choice was paid approximately $2,837.50 for home health services purportedly provided to A.L. between in or around January and March of 2013.

d.    *Medicare beneficiary C.M. (Life Choice)*

36.    On or about October 23, 2014, Medicare beneficiary C.M. told agents that she has never received home health care services. C.M. further noted that on only one occasion did her doctor sent a nurse to her home to follow up with wound care for a procedure performed in the doctor's office. However, C.M. stated that this took place approximately four years ago.

37.    C.M. denied receiving any services through a company called Life Choice and denied knowing who Javed Akhtar was. C.M. was provided an opportunity to review Life Choice documents supplied to Medicare, and indicated that the signatures on the documents resembled hers, but were not her signatures. In fact, C.M. stated that her first name appeared to be misspelled in some of the signatures. C.M. also stated that she has never received home health care services. C.M. said that she has lupus and diabetes and travels from Flint, Michigan, to Warren, Michigan, twice a month to see her regular physician for care. C.M. also stated that several years ago, C.M. went to a facility to receive physical therapy but that she injured herself during the receipt of that therapy. Following that, C.M. stated that her doctor no longer allows her to receive physical therapy.

16

38.    Medicare claims data shows Life Choice was paid approximately $4,943.55 for home health services purportedly provided to C.M. between in or around February and April 2013.

        e.    *Latonia Armstrong, relative of Medicare beneficiary R.G. (Angle's Touch)*

39.    On or about July 11, 2014, Latonia Armstrong told agents that a man named "J" who was trying to open his own home health care business between 2009 and 2011 told her that he would pay her $100 per Medicare beneficiary she referred.  Armstrong referred her aunt, W.G., to "J" and was paid by "J" for the referral.  Armstrong also said that, after she had referred W.G. to "J", W.G. told her that "J" was billing for services he did not provide.  Armstrong described "J" as a small "Indian" man who wore glasses.  When shown a photograph of Javed Akhtar, Armstrong indicated that Akhtar could be "J."

        f.    *W.G., mother of Medicare beneficiary R.G. (Angle's Touch)*

40.    On or about July 11, 2014, W.G. told agents that an unnamed "Indian" man came to her home with a nurse, and that the man paid her son, Medicare beneficiary R.G., between $100–200 in exchange for signing up for home health care.  W.G. also said that the same man paid her niece "Tanya" for the referral of R.G.  W.G. also confirmed that this same man had R.G. sign multiple blank forms.

When shown a photograph of Javed Akhtar, W.G., identified Akhtar as that man who paid her son, R.G, and her niece.

41.     Medicare claims data shows Angle's Touch was paid approximately $3,640.96 for home health services purportedly provided to R.G. between in or around September and October 2010.

### 3)     Review of Medicare Claims Data

42.     A review of Medicare claims data shows that Medicare was billed by Angle's Touch and Life Choice for home health care purportedly provided to the same ten beneficiaries.  Claims data shows that ten beneficiaries were each billed to Medicare first by Angle's Touch and then by Life Choice.  Based on claims submitted for these ten beneficiaries, Medicare paid Angle's Touch a total of approximately $61,316.54 and paid Life Choice a total of approximately $92,689.49, for a grand total of approximately $154,006.03.

43.     Based on a review of Medicare claims data, your Affiant has confirmed that Life Choice has been paid approximately $2.72 million by Medicare from on or about January 1, 2010, to on or about October 17, 2014.

### 4)     Review of bank records

44.     An examination of bank records revealed that, from on October 2011 through on or about May 2014, approximately 106 checks were issued from a Life

Choice bank account (Chase Bank account number XXXXXX8417) to Javed Akhtar, totaling $428,153.31.

## CONCLUSION

45.    In summary, the evidence shows that Javed Akhtar paid kickbacks to recruit patients to sign up for home health care services at both Life Choice and Angle's Touch that were never rendered and were not medically necessary.  It also shows that Akhtar owned and controlled a home health agency, Life Choice, that billed Medicare for services that were never rendered and/or medically unnecessary, and or where the referral was obtained through the payment of kickbacks.

46.    Based on your affiant's training and experience and the facts presented herein, your affiant respectfully submits there is probable cause to believe that Akhtar violated 18 U.S.C. §§ 1347 (Health Care Fraud), 1349 (Conspiracy to Commit Health Care Fraud), and 371 (Conspiracy to Pay or Receive Health Care Kickbacks).

47.   As such, your affiant respectfully requests that an arrest warrant be issued for Javed Akhtar.

Respectfully submitted,

Lauren A. Williamson
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed to before me this 5 day of November, 2014.

United States Magistrate Judge
Detroit, Michigan